**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

| | |
|---|---|
| In re:<br><br>**IDL DEVELOPMENT, INC.,**<br><br>         **Debtor.** | **Chapter 11**<br>**Case No. 18-14808-CJP** |
| **CONTINUUM ENERGY TECHNOLOGIES, LLC and**<br>**ELECTROMAGNETICS CORPORATION,**<br><br>         **Plaintiffs,**<br><br>**v.**<br><br>**IDL DEVELOPMENT, INC.,**<br><br>         **Defendant.** | **Adversary Proceeding**<br>**No. 19-01013-CJP** |

**OPPOSITION TO PARTIAL MOTION TO DISMISS COUNTERCLAIM**
**AND MEMORANDUM OF LAW**

The Chapter 11 Debtor, Defendant and Plaintiff-in-Counterclaim, IDL Development, Inc.

("**IDL**" or the "**Debtor**"), hereby opposes the motion [docket no. 13] (the "**Motion to Dismiss**")

by Continuum Energy Technologies, LLC ("**CET**") and Electromagnetics Corporation ("**ELC**"),

the Plaintiffs and Defendants-in-Counterclaim and with (collectively, the "**Plaintiffs**") to dismiss

Counts II, III, and IV of IDL's Counterclaim [docket no. 11] (the "**Counterclaim**") and states as

follows:

**PRELIMINARY STATEMENT**

On or about November 28, 2014, CET ceased relevant research operations due to lack of

funding.  Thereafter, Dr. Christopher Nagel founded IDL.  At all times IDL engaged in

1

materially distinct research from CET and developed materially distinct intellectual property from CET.  CET acknowledged this in a March 2018 settlement where it assigned to IDL all of the intellectual property developed by IDL or IDL employees on and after November 28, 2014 (as defined below, the "**Assigned IP**").  Notwithstanding that it relinquished any claim that it had or may have had to the Assigned IP in the Settlement Agreement, CET asserts an interest in and a right to take possession of the Assigned IP, and the Debtor's other intellectual property, in this proceeding and in the Debtor's related Chapter 11 case.

CET has also asserted claims against the Debtor for not less than $11,500,000, including priority claims of not less than $2,150,000, on account of certain intellectual property which it licensed to IDL beginning in March 2018 (as defined below, the "**Licensed IP**").  IDL has never used the Licensed IP and upon information and belief, CET has never otherwise commercialized the Licensed IP.

CET filed this adversary proceeding less than six weeks into the Debtor's bankruptcy proceeding at a time when it had a motion for relief from stay pending [docket nos. 17, 41] (the "**Motion for Relief**").  IDL disputes the claims of CET in this litigation and its claims in IDL's bankruptcy case, which cloud the title to the Assigned IP and other intellectual property of the Debtor.  Accordingly, the Debtor has filed the Counterclaim seeking (a) declaratory judgment that that the Debtor is the owner of the Assigned IP and all other intellectual property and that no such intellectual property constitutes property of CET (Count I); (b) related injunctive relief (Count II); (c) to avoid or modify, as a fraudulent transfer, the obligations created under the License Agreement (Count III); and (d) damages under M.G.L. ch. 93A (Count IV).

CET's Motion to Dismiss seeks to dismiss only counts II-IV of the Counterclaim.  It does not seek to dismiss Count I (Declaratory Judgment).  Each of Counts II-IV is a compulsory

counterclaim and each is supported by well-pleaded factual allegations and all reasonable

inferences that can be drawn from them.  Accordingly, the Motion to Dismiss should be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

From 1999 to 2014, Dr. Christopher Nagel was an employee and principal of CET

together with John Preston ("**Preston**"), Dr. Nagel's former business partner.  Counterclaim at

¶6.  CET was a research entity. *Id*.  Its designated field of research involved modifying the

properties of metals, whereas IDL's designated field of research involves self-assembly,

particularly of known metals. *Id*. at ¶¶6, 13. Dr. Nagel served as the lead scientist, principal

researcher, and Chief Technical Officer at CET.  *Id*. at ¶6.  He led a team of ten (10) other

scientists and researchers. *Id*. at ¶7.   Preston is the Chief Manager of CET, and is and has, at all

times, been responsible for managing the business and financial affairs of CET. *Id*. at ¶6.

In late 2014 CET effectively ran out of money. *Id*. at ¶9. As a result of CET's financial

difficulties, it terminated most of its employees including Dr. Nagel and nearly all of his

technical team effective as of November 28, 2014 and shortly thereafter ceased conducting

research related to Dr. Nagel's work.  *Id*. at ¶10.

IDL was formed in December 2014. *Id*. at ¶11.  IDL is a research entity. *Id*.  Between

2015 and late 2018, IDL conducted robust research in its designated field of self-assembly using

electromagnetic chemistry. *Id*. at ¶12.

In September 2015, Preston and CET filed a complaint against Dr. Nagel and IDL in

Middlesex County Superior Court, captioned as *Preston, et al. v. Nagel, et al.*, Civ. Action No.

15-CV-572 (the "**CET Litigation**"). *Id*. at ¶17.  CET's complaint asserted, among other things,

that IDL had converted certain unspecified intellectual property of CET.  *Id*. CET did not

identify the intellectual property of CET that IDL had allegedly converted.  *Id*. It did not assert a

count for patent infringement and any other intellectual property that CET may have owned was abandoned by operation of law due to the cessation of its research. *Id*.

IDL denied the pertinent allegations in CET's complaint. *Id*. at ¶18. Among other things, IDL's field of research is based upon a different underlying theory than that used by CET and IDL uses materially different intellectual property, methods, materials, and processes which were publicly available at the time of IDL's formation, were made publicly available by CET prior to November 28, 2014, or were newly discovered by IDL after November 28, 2014. *Id*.

The CET Litigation required IDL to spend millions of dollars over more than two years to defend against CET's vague claims, which funds could have been better invested in advancing IDL's development. *Id*. at ¶19. The CET Litigation also prevented IDL from obtaining additional funding for its research. *Id*. Although IDL was confident that it would ultimately prevail against CET's spurious claims, IDL determined to settle the matter, to avoid the ongoing costs and uncertainty associated with the CET Litigation. *Id*. Accordingly, IDL, CET and others executed and consummated a certain settlement agreement (the "**Settlement Agreement**"). *Id*. Pursuant to the Settlement Agreement, and among other things:

    a.    IDL paid to CET a one-time settlement payment of $4,870,952.56;

    b.    CET released all claims against IDL as of the date of the Settlement Agreement;

    c.    CET assigned, and transferred to IDL all intellectual property "that was created, conceived or developed by IDL after November 28, 2014 by Nagel or any other former CET employee employed by IDL and in which CET has or claims to have any right, title or interest" (the "**Assigned IP**").

*Id*. at ¶20. On or about March 15, 2018, the parties consummated the Settlement Agreement, and IDL paid and delivered to CET all payments and other deliverables due to CET under the Settlement Agreement. *Id*. at ¶21; *id*. at Exhibit A.

Contemporaneously with the execution of the Settlement Agreement, IDL and the Plaintiffs entered into a certain license agreement, the ("**License Agreement**") the Plaintiffs licensed to IDL, on an exclusive or non-exclusive basis, certain intellectual property, "[c]ontrolled, in whole or in part, by ELC or CET or any of their respective Affiliates as of November 28, 2014, excluding the Glassy Metals Patent" (as defined in the License Agreement, the "**Licensed IP**"). *Id*. at ¶22; *id*. at <u>Exhibit B</u>.   Under the License Agreement, IDL agreed to pay to CET a fee of $9,500,000 on or before September 30, 2018 (the "**License Fee**"), and a royalty payment on net sales of products created with the Licensed IP up to $48,000,000. *Id*. at ¶23.

IDL does not use or require the use of the Licensed IP, as it only uses the Assigned IP and other intellectual property materials, methods, and combinations of methods developed by IDL subsequent to November 28, 2014 which are critically distinct from the intellectual property, materials, methods, and combination of methods utilized by CET prior thereto.  *Id*. at ¶25.

Although the Settlement Agreement resolved the CET Litigation, the costs incurred in the litigation and the monetary obligations under the License Agreement required IDL to raise capital to meet its obligations.  *Id*. at ¶26.  IDL's efforts to do so were unsuccessful and IDL was not able to pay the License Fee due to CET by September 30, 2018. *Id*.  Thereafter, CET sought to take possession of certain of IDL's assets.  IDL commenced this proceeding by the filing of a voluntary petition for relief under Chapter 11 of 11 U.S.C. §§101, *et seq*. (the "**Bankruptcy Code**") on December 29, 2018 in order to prevent CET from taking any action with respect to its assets, to otherwise preserve its assets, and to pursue its reorganization.  *Id*. at ¶27.  IDL is pursuing a sale in its bankruptcy case. *Id*. at ¶28.

On April 9, 2019, the Debtor filed a motion to approve a private sale of substantially all

of its assets (the "**Purchased Assets**") [docket no. 120] (the "**Sale Motion**") and a related bid

procedures motion [docket no. 121] (the "**Bid Procedures Motion**").  On April 18, 2019, the

Court entered an agreed upon order approving the Bid Procedures Motion.  The Debtor has

provided notice of the sale and the approved bid procedures to all of the Debtor's creditors, all

relevant taxing and governmental authorities, and all known parties with an interest in

purchasing the Purchased Assets.  The Court has scheduled a hearing on CET's stated objection

to the sale for May 6, 2019 at 10:00 a.m. and a hearing on the Sale Motion for May 15, 2018 at

10:00 a.m.  CET has filed two claims against the Debtor's estate, one in the amount of

$9,500,000 apparently on account of the License Fee [Claim no. 5-1], and another in the amount

of $38,500,000 apparently on account of the unmatured royalties under the License Agreement

[Claim no. 6-1].  The second claim includes an asserted priority claim under 507(a)(2) in the

amount of $2,141,683 for alleged post-petition diminution in the value of the Licensed IP, which

CET asserts is continuing.

## STANDARD OF REVIEW

For purposes of reviewing a motion to dismiss under Rule 12(b)(6), the Court accepts as

true all well plead allegations in the complaint or counterclaim "and all reasonable inferences

that can be drawn from them after construing them in the light most favorable to the non-

movant." *Foglia v. Renal Ventures Mgmt.*, *LLC*, 754 F.3d 153, 154 n. 1 (3d Cir. 2014).  *See also*

*Banco Santander de Puerto Rico v. Lopez-Stubbe (In re Colonial Mortg. Bankers Corp.)*, 324

F.3d 12, 15 (1st Cir. 2003).  Dismissal is required only if the Counterclaim fails to state a claim

upon which relief can be granted. Rule 12(b)(6) is considered with Federal Rule of Civil

Procedure 8(a)(2), which states that a complaint is to contain "a short and plain statement of the

claim showing that the pleader is entitled to relief." As the Supreme Court observed, the standard

is one of plausibility.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has

facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009). The standard "simply calls for enough fact[s] to raise a reasonable

expectation that discovery will reveal proof of" the necessary elements. *Twombly* at 556.  In

analyzing a complaint or counterclaim, a court should determine if a plaintiff has "nudged their

claims across the line from conceivable to plausible." *Bell Atlantic Corp*, 550 U.S. at 570.  *See

also Acevedo v. Wells Fargo Bank, N.A. (In re Acevedo)*, 2015 Bankr. LEXIS 1382 at \*14-15

(Bankr. C.D. Mass. April 21, 2015).  The Debtor has exceeded this standard and has set forth

cognizable and plausible claims against CET in Counts II-IV of the Complaint, which should not

be dismissed.

## ARGUMENT

### I.     The Debtor Has Stated a Basis for Injunctive Relief.

The Plaintiffs assert that Count II of the Counterclaim must be dismissed because there is

no underlying claim to justify the requested injunction.  This is not so.  Count I states a claim for

declaratory judgment, which the Plaintiffs have not sought to dismiss.  Count II is a corollary to

Count I in that a ruling that the Debtor is the owner of the Assigned IP and all of its other

intellectual property warrants an injunction restraining and enjoining the Plaintiffs from re-

commencing repetitious, damaging litigation against IDL.  Clearly, when the Counterclaim is

viewed as a whole, IDL has set forth grounds for equitable relief.

The Counterclaim sets forth the other necessary elements for the issuance of an

injunction, under the Settlement Agreement, CET assigned the Assigned IP to IDL on March 15,

2018. Counterclaim ¶20(c).  It alleges that IDL complied with the terms of the Settlement

Agreement, paid to CET all amounts due under the Settlement Agreement, and delivered all

deliverables to CET under the Settlement Agreement. *Id*. at ¶21.  It alleges that the Settlement

Agreement was otherwise consummated. *Id*.  It further alleges, that the CET Litigation damaged

IDL by draining its research resources and impairing its pursuit of new investment (*id*. at ¶19)

and that, notwithstanding the claims released under the Settlement Agreement, CET commenced

this proceeding and asserted claims in the Debtor's Chapter 11 proceeding which are harming

IDL, diverting its resources, and impairing its reorganization. (*id*. at ¶28).  *See e.g. Cox Com,*

*Inc. v. Chaffee*, 536 F.3d 101, 112 (1st Cir. 2008) (listing elements required for injunctive relief)

(internal citations omitted).  Having done so, the request for an injunction should be preserved.

*See Koufos v. U.S. Bank, N.A.*, 939 F.Supp. 2d 40, 46 (D. Mass. 2013) (preserving prayer of

injunctive relief in connection with declaratory judgment claim); *Green v. Parts Distrib. Xpress,*

*Inc.*, 2011 U.S. Dist. LEXIS 136616 at *16 (D. Mass., Nov. 29, 2011) (construing count for

injunction as prayer for injunctive relief).  Based upon the foregoing, the Court should not

dismiss IDL's injunction request.

## II.     **The Debtor Has Stated a Claim to Avoid or Modify the Obligations under the License Agreement.**

Count III of the Counterclaim seeks to avoid or modify the payment Obligations (as that

term is defined in the Counterclaim) under the License Agreement.  The Plaintiffs have not

alleged that the Debtor's allegations are insufficient or defective to support Count III.  Rather the

Plaintiffs seek to dismiss Count III claiming IDL is estopped from asserting Count III either (a)

under the theory of judicial estoppel, or (b) because a contract may not be partially assumed in a

bankruptcy case.  Judicial estoppel does not apply in this case and the Debtor is not attempting to

partially assume the License Agreement.

### A.   Judicial Estoppel Does Not Apply.

Application of judicial estoppel typically requires the presence of three elements in conjunction: (a) that the party to be estopped has taken clearly inconsistent positions, (b) that the party succeeded in persuading a court to accept the earlier position, *and* (c) the party stands to derive an unfair advantage. *See Perry v. Blum*, 629 F.3d 1, 8-9 (1st Cir. 2010) *citing New Hampshire v. Maine*, 532 U.S. 742, 749-50, 212 S.Ct. 1808, 149 L.Ed. 2d 968 (2001); *Alt. Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 32 (1st Cir. 2004).  In seeking to bar IDL from bringing Count III against it, the Plaintiffs misstate the Debtor's prior positions and the Court's ruling on CET's Motion for Relief.  The Debtor has not taken inconsistent positions on which the Court has relied.  Accordingly, IDL is not judicially estopped from asserting Count III.

The Debtor has never asserted that it received reasonably equivalent value in exchange for the Obligations incurred under the License Agreement.   In fact, IDL never asserted any position regarding the value of the Licensed IP in the context of the Motion for Relief.  Rather, IDL has consistently maintained simply that, although it does not use or otherwise require the Licensed IP, a purchaser of its assets may want to acquire its rights under the License Agreement in order to the avoid the ongoing costs, expenses, and delay associated with an obviously litigious CET.  IDL has stated that it uses "different methods and combinations of methods to invoke new chemistries on the electromagnetic field which are critically distinct from the research and techniques utilized by CET."  *See* affidavit of Christopher J. Nagel [Chapter 11 docket no. 74] ("**Nagel Affidavit**") at ¶13.  *Compare* Counterclaim at ¶13.  It has further asserted that "[i]t never utilized any patents or trade secrets, to the extent such trade secrets existed, developed by CET." Nagel Affidavit at ¶13; compare Counterclaim at ¶13. Finally, it has repeatedly stated that "[IDL] has not and does not use the Licensed IP in its research." *Id*. at ¶42;

compare Counterclaim at 6.  Each of these assertions supports IDL's claim that it did not, in fact,

receive reasonably equivalent value in exchange for the payment obligations under the License

Agreement.

Notwithstanding IDL's stated position that it does not use the Licensed IP, the Debtor's

investment banker opined that:

> IDL's assets are more valuable with the License Agreement in place and that
> given the claims made by CET as to IDL's intellectual property and the history of
> litigation between the parties, a purchaser of the IDL's assets (sic) may want the
> option of retaining the License Agreement in order to avoid the costs of future
> disputes and litigation.  This opinion is supported by my experience and
> discussions with the Potential Purchaser.

*See* declaration of Lawton Bloom [Chapter 11 docket no. 84 at ¶7].  These statements are not

inconsistent.  The value of the Licensed IP to the Debtor, which does not use it, and the value of

the License Agreement to a prospective purchaser of the Debtor's assets, which may seek to

avoid the costs of future litigation, are materially different.  Regardless, neither is a statement of

equivalence required under 11 U.S.C. §548.

Even if the Debtor had previously asserted that the Obligations constituted reasonably

equivalent value under the License Agreement, the Court did not rely on any of the Debtor's

statements, or those of Mr. Bloom, in denying CET's Motion for Relief.  The Court denied the

Motion for Relief because "CET *did not introduce evidence* from which this Court could find

that the Debtor's interest in the License Agreement with CET was a 'wasting asset.'"  *See* order

denying Motion for Relief [Chapter 11 docket no. 105] (the "**<u>Stay Denial Order</u>**") at 3

(emphasis added).  Because the Court based its decision on CET's failure to meet its burden and

not upon any statement of IDL, judicial estoppel does not bar Count III.  See *Blum*, 629 F.3d at

11 (party proposing application of judicial estoppel "must show that the court adopted and relied

on the represented position either in preliminary matter or as part of a final disposition").  The

Plaintiffs have not met their burden to apply judicial estoppel. The Court did not rely upon Mr. Bloom's opinion in the Stay Denial Order. Instead it relied upon CET's failure to meet its burden under Section 362(g).

### B.    The Debtor Is Neither Partially Assuming, Nor Partially Rejecting the License Agreement

Count III of the Counterclaim is premised upon the potential rejection of the License Agreement. It neither seeks to assume, nor reject the License Agreement, in whole or in part. Rather, Count III seeks to either avoid or modify the Obligations to provide for reasonable compensation to CET under the License Agreement. IDL was required to assert Count III because the Plaintiffs filed this case against it. IDL has sufficiently plead Count III and stated a plausible, cognizable claim under 11 U.S.C. §548 for which relief may be granted. Accordingly Count III should not be dismissed.

The Debtor could not wait to assert Count III until after rejection of the License Agreement because it is a compulsory counterclaim because it arises out of the transaction or occurrence that is the subject matter of this case (the License Agreement) and does not require the addition of any other party to this proceeding. *See* Fed.R.Civ.P. 13(a). If the License Agreement is rejected, the Debtor will have held a license to the Licensed IP, which it does not use, for only approximately one year, for which CET asserts to be owed not less than $9,500,000, including more than $2,000,000 in priority claims. Although the determination of whether to assume or reject the License Agreement has not been made and is not yet required to be made, the Debtor was required to assert Count III at the time of answering the Complaint. *See Tencaar v. Gable (In re Tenzcar)*, 466 B.R. 32, 38 (Bankr. D. Mass. 2012) ("[t]he failure to bring a compulsory counterclaim is fatal to that claim") *citing Baker v. Gold Seal Liquors, Inc.*, 417 U.S. 467, 469, 94 S.Ct. 2504, 41 L.Ed. 2d 243 (1974).

The Debtor has asserted facts sufficient to support Count III.  It asserts that the License

Agreement was signed less than ten months prior to the commencement of the Debtor's Chapter

11 case and less than seven months before CET purported to take steps to terminate the License

Agreement.  Counterclaim at ¶22.  It states that IDL does not use the Licensed IP (*id*. at p. 6.)

and that the Licensed IP has little intrinsic value to the Debtor (*id*. at ¶38).  It states that the

valuations of the Licensed IP do not support the amount of the Obligations.  *Id*. at ¶37.  It alleges

the other elements required under 11 U.S.C. §548.  *Id*. at ¶¶39-41.  Those allegations are

sufficient at the pleading stage.  Whether the Debtor actually received reasonably equivalent

value is a fact-specific inquiry which is not appropriate for disposition in the context of a motion

to dismiss. *See e.g. In re Comprehensive Power,* 578 B.R. 14, 33 (Bankr. D. Mass. 2017)

("Reasonably equivalent value determination should be based on all of the facts and

circumstances of the case. The Court should 'compare what was given with what was

received.'").  Although the License Agreement may ultimately be assumed, or rejected, and

damages determined accordingly, that fact does not bar Count III of the Counterclaim.

### III.      IDL Has Sufficiently Plead A Claim under Chapter 93A.

The Plaintiffs' sole argument to dismiss Count IV of the Counterclaim is that the Debtor

has not sufficiently pled the existence of a qualifying business relationship between the parties,

notwithstanding its substantial disputed claims against the Debtor's estate under the License

Agreement.   Contrary to the allegations in the Motion to Dismiss, IDL has pled facts sufficient

to plausibly establish a commercial relationship in a business context, rendering ch. 93A

applicable to the Plaintiffs' conduct.  *See Linkage Corp. v. Trustees of Boston Univ*., 425 Mass.

1, 22-23, 679 N.E.2d 191, cert denied, 522 U.S. 1015, 118 S.Ct. 599, 139 L.Ed. 2d 488 (1997)

(M.G.L. ch. 93A requires dual inquiry whether there was a commercial transaction between two entities engaged in trade or commerce, such that they were acting in a "business context").

The Debtor has pled the existence of the License Agreement in the Counterclaim. Counterclaim at ¶22.  The License Agreement is indisputably an arms-length transaction between separate legal entities, which establishes a commercial relationship between IDL and the Plaintiffs.  *See e.g. Milliken & Co. v. Duro Textiles, LLC*, 451 Mass. 547, 563 (2008) *citing Newton v. Moffie*, 13 Mass.App.Ct. 462, 467, 434 N.E. 2d 656 (1982).  The Counterclaim similarly states that the Plaintiffs and IDL engaged in trade or commerce.  It sets forth that under the License Agreement, the Plaintiffs licensed to IDL the Licensed IP on an exclusive and non-exclusive basis in exchange for the payment of fees and royalties (Counterclaim at ¶¶22-23) and agreed to provide certain other services to CET (Counterclaim at ¶24).  That is sufficient to plausibly conclude that the parties engaged in trade or commerce.  *See Linkage Corp.*, 425 Mass. at 23-24 (M.G.L. ch. 93A "provides that 'trade' and 'commerce' include 'the sale, rent, lease or distribution *of any services and any property*'") (emphasis in original).

Accordingly, Count IV should not be dismissed.


*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, based upon the foregoing, IDL Development, Inc. respectfully requests that the Court enter an order denying the Plaintiffs' Motion to Dismiss and granting such other and further relief as is necessary and appropriate under the circumstances.

Respectfully submitted,

**IDL DEVELOPMENT, INC.**

By its attorneys,

 */s/ Christopher M. Condon*
Charles R. Bennett, Jr. (BBO #037380)
Christopher M. Condon (BBO #652430)
Murphy & King Professional Corporation
One Beacon Street, 21st Floor
Boston, Massachusetts  02108-3107
Telephone:  (617) 423-0400
Facsimile:  (617) 423-0498
Email:  cbennett@murphyking.com
          cccondon@murphyking.com

Dated: April 26, 2019

## CERTIFICATE OF SERVICE

I, Christopher M. Condon, hereby certify that on this date I caused a copy of the foregoing opposition and memorandum of law to be filed and served pursuant to the Court's CM/ECF system upon all such parties entitled to notice thereunder and served by first-class mail postage prepaid upon:

Jeremy R. Fischer, Esquire
Adriane E. Fouts, Esquire
Drummond Woodsum
84 Marginal Way, Suite 600
Portland, Maine 04101

Dated: April 26, 2019                              */s/ Christopher M. Condon*
                                                  Christopher M. Condon